UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————X

UNITED STATES OF AMERICA,

Plaintiff,                                        **AFFIRMATION**

                                                  **18-cr-602 (WHP)**

-v.-

MICHAEL COHEN,

Defendant.

——————————————————————X

MICHAEL COHEN makes the following allegations under the penalty of perjury:

1. Your Affirmant is the Defendant in connection with the above captioned case, and as such is familiar with the facts and circumstances surrounding this case. Affirmant is currently confined under the custody of the Federal Bureau of Prisons (B.O.P.) and assigned to the Otisville Satellite Camp, serving at three year sentence imposed on December 12, 2019 by the United States District Court, Southern District of New York (Pauley, J.) (see Judgment and Commitment order annexed as exhibit "A").

2. This affidavit is submitted in support of a motion, pursuant to Federal Rule of Criminal Procedure (F.R.C.P.) 35(b), seeking a sentence reduction of the previously imposed December 12, 2019 sentence (see exhibit "A") to a year and a day, or, in the alternative, that it be served on "home confinement." No reduction in the duration of the previously imposed sentence is sought. Additionally, if released on "home

1

confinement," Your Affirmant is willing to provide one (1) day per week of community service while under the supervision of the Probation Department.

## BACKGROUND

A. The Charges

4. Counts 1 through 5 involved the filing of federal tax returns which omitted gross income derived from (a) taxi medallion rental income, and (b) a personal loan proceeds. The taxi medallion income was openly deposited into New York City, and were consequently reflected as "deposits" on the monthly bank statements provided to the tax preparer. No "1099" forms were, however, provided to Affirmant to alert him concerning this income. Moreover, the same tax preparer (Jeffrey Getzel, C.P.A.) who prepared the tax return of the party remitting the funds to Affirmant also prepared Affirmant's tax returns. Under these circumstances, the accountant's failure to include these payments to Affirmant is inexplicable. However, upon information and belief, the accountant was confronted by federal law enforcement agents, and cooperated against Affirmant. It is unclear what he told the investigators, as reflected in their interview notes, and whether any "Brady" material wasn't disclosed.

5. Mindful that the Government has a perceived myopic view of "Brady" material, Affirmant urges the Court to direct the Government to provide any existing "Brady" or "Giglio" material.

6. Count 6 involved making false statements to obtain a "line of credit." Counts 7 and 8 charged Affirmant with the commission of campaign finance fraud. The aforesaid plea was pursuant to a November 29, 2018 "plea agreement." At the time the "line of credit" (L.C.) was issued, Your Affirmant had more than three times the amount, and the L.C. was collateralized by an asset which had a 10 to 1 coverage ratio.

2

B. The Sentence

7. Affirmant appeared before District Judge William H. Pauley on December 12, 2018 for sentencing. Assistant United States Attorney Nicholas Roos noted at pages 20 to 21 that, in the United States Attorney's Office, S.D.N.Y.'s view, Affirmant had not "[c]ome anywhere close to assisting this office in an investigation" (sentencing minutes, page 20). He further noted that Affirmant did not pursue a path of "full cooperation," did not provide "substantial assistance," and noticeably lacked a "5-K letter" (sentencing minutes, page 21)(see exhibit "B").

8. When sentencing Affirmant, the Court expressly noted: *"While Mr. Cohen pledges to assist the Special Counsel's Office in further investigations, that is not a matter that this court can consider now"* (sentencing minutes, pages 34 to 35 [exhibit "B"]).

## THIS MOTION

9. When the Court sentenced Affirmant, it did so, of necessity, predicated upon the cooperation which Defendant had voluntarily provided prior to that date. As will be explained *infra*, since that date, and prior to Affirmant's May 6, 2019 self-surrender to the Otisville Camp, Affirmant provided proactive cooperation to a variety of legislative branch government committees, which are fully enumerated in the annexed affirmation of Affirmant's Washington, D.C. based counsel Lanny Davis, Esq. (see exhibit "C"). These include, but are not limited to *inter alia*:

(a) Special Counsel Robert Mueller's office

(b) U.S. Attorney for the Southern District of New York

(c) New York State Attorney General Letitia James

(d) the New York County District Attorney

## COOPERATION

10. The four most significant facts derived from Affirmant's testimony stemmed from (a) the June 9, 2016 Trump Tower meeting, (b) the Air Force One press release, (c) the July, 2016 Roger Stone call to Mr. Trump regarding the hacked Democratic National Convention (D.N.C.) emails released by Wikileaks, and (d) the Trump Tower Moscow deal.

11. Further cooperation included three "closed door" sessions with the House "Permanent Select Committee on Intelligence." Each such session lasted approximately ten hours.

12. An "open hearing" was held on February 27, 2019 with the House Oversight Committee, chaired by the late Elijah Cummings, lasting approximately nine hours.

13. Two private meetings were held with Chairman Jerrold Nadler's House Judiciary counsel Norman Eisen, Esq. to review (a) information, and (b) documents previously seized and released by the Government in furtherance of their investigation.

14. One meeting with the Office of the New York State Attorney General took place, which included questions regarding both (a) the "Trump Organization," and (b) the "Trump Foundation," as well as Affirmant providing documents concerning Evgeny "Gene" Freidman's multimillion dollar fraud scheme defrauding the Metropolitan Transit Authority and the New York City Taxi and Limousine Commission surcharges which he collected on behalf of taxi medallion owners from taxicab drivers. Information was, as well, provided concerning a $300 million money laundering scheme involving a New York based Russian. Inexplicably, no action, however, was taken on either matter. Subsequently, a civil case in Supreme Court, New York County

brought by the Attorney General's "Charities Bureau" resulted in the payment of a $2 million "civil penalty" by Mr. Trump.

15. One meeting was held with the New York City Department of Taxation (D.O.T.) regarding Mr. Freidman's tax fraud, which included documents demonstrating that he continues conducting in the transportation industry business, leasing converted yellow cabs into "ridesharing vehicles." Upon information and belief, no action was taken regarding this matter.

16. Even while incarcerated, Affirmant has undertaken to make himself available to the Government, including three meetings with the New York County District Attorney's Office in furtherance of their investigations. Said meetings lasted approximately ten hours. The result of these meetings was, in part, to undertake to corroborate the claims and action instituted in *Vance v. Trump*, __ F. 3d __ [2nd Cir. 2019] currently pending U.S. Supreme Court review.

17. Your Affirmant has devoted approximately 170 hours providing testimony to some eight different governmental agencies, in furtherance of their duties and obligations. Those 170 hours pale in comparison to the number of hours spent in preparation.

### THIS MOTION/AFFIRMANT'S "ASK"

18. In seeking a sentence reduction (not a modification) as a first offender, Affirmant has been (a) disbarred, (b) financially crushed, and (c) personally embarrassed and humiliated.

19. All that Affirmant thought was important and valuable has been painfully revealed as derived, as if through a "Faustian bargain." Like former White House counsel John Dean observed in his book "Blind Ambition," Affirmant thought

5

being Donald Trump's lawyer made him a "big man." Affirmant now realizes, as he walks the Otisville Camp paths, that he, in fact "sold his soul," and foolishly frittered away his integrity. The conviction for lying to Congress, as previously stated in Deponent's attestation was done for the benefit of President Donald J. Trump, and urged by counsel Jay Sekulow, Esq.

20. Affirmant became an "enabler" of both the "Trump Organization," and Donald Trump personally. Mr. Trump can, Affirmant confesses, be both magnetic, powerful and charismatic. Affirmant now sees what Iago meant in Shakepeare's "Othello" when he said "He who steals my purse steals trash, he who steals my good name steals all." Affirmant finds himself morally wounded, but the wiser.

21. Affirmant painfully recognizes the need to appropriately atone for his misconduct. For a man married 25 years with two children, being incarcerated is a powerful and painful humbling punishment. Your Affirmant respectfully contends that a sentence reduction to a year and a day...

23. Part of Affirmant's "personal atonement" will consist of the performance of "community service." It is Affirmant's hope that the Court will grant this application to reduce his sentence to a year and a day, or, in the alternative, to permit him to serve the balance of the court imposed sentence on "home confinement," under the supervision of the Probation Department.

WHEREFORE, Affirmant respectfully prays that the motion be granted, and a hearing ordered.

Dated:      New York, New York
            December 10, 2019

/s/Michael D. Cohen
Michael D. Cohen

6